UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TENNESSEE GAS PIPELINE COMPANY,

                              Plaintiff,

        vs.

NEW ENGLAND POWER COMPANY et al.                C.A. 05-10284-MEL

        Defendants and Potentially
        Interested Parties.

## AFFIDAVIT OF DAL BECK

I, Dal Beck, do hereby depose and say:

1.    I am a principal Property Rights Specialist for Tennessee Gas Pipeline Company
      ("Tennessee"), and I have personal knowledge of the facts stated herein.

2.    I am involved in overseeing the negotiating and acquiring of rights-of-way for Tennessee
      for the Tewksbury-Andover lateral project.

3.    Tennessee's communication with representatives of J.W. South Street Realty Trust
      including Mr. Jitendra Seth concerning easement acquisition began in June 2003 after
      negotiating survey permission between June and October 2002.

4.    Tennessee did communicate on multiple occasions over many months with
      representatives of J.W. South Street Realty Trust, including Mr. Seth, concerning a
      potential route change which would have incorporated a curved horizontal directional
      drill ("HDD").  However, no agreement was ever reached because the parties could not
      agree on terms of the easement agreement.  As a result, by letter dated January 20, 2005
      Tennessee withdrew all prior offers.  Attached hereto as Exh. A. is a true and accurate
      copy of Tennessee's letter dated January 20, 2005.

5.    In addition, FERC rejected an alternative route which was proposed by J.W. South Street
      involving a two-stage HDD to avoid J.W. South Street's planned two-story parking
      garage as discussed in the August 31, 2004 Environmental Assessment (pps. 29-30).
      Attached hereto as Exh. B is a true and accurate copy of the relevant pages of FERC's
      Environmental Assessment dated August 31, 2004.

Signed Under the Pains and Penalties of Perjury this 5TH Day of May, 2005.

_____
Dal Beck

# 2815989_v1



Tennessee
Gas Pipeline
an El Paso company

Sent via Regular Mail, and by
FAX to 508-752-0130

Attorney John Maciolek
Berg & Laipson
34 Mechanic Street
Worcester, Massachusetts 01608-2493

January 20, 2005

Re: Your FAX of January 4, 2005/ J.W. South Street Realty Trust

Dear Attorney Maciolek:

       I am writing to withdraw Tennessee Gas Pipeline's ("TGP") prior offer to your client JW South Street Realty Trust. This offer, relating to a deviation in TGP's proposed crossing of your client's property with a natural gas pipeline, was most recently conveyed to you in our letter of October 26, 2004. Your response came over two months later and was essentially non-responsive. In that letter, Tennessee made clear its position that changes beyond what was once agreed to by your office and Tennessee would not be acceptable to Tennessee. Consequently, any prior offer made by TGP to alter or change its proposed pipeline crossing along with any monetary offers is rescinded.

    If you have any further questions or need any further information on this particular situation, please do not hesitate to call.

Sincerely,

John T. Gavin
Contract Property Rights Specialist
Tennessee Gas Pipeline Company

EXH. A.

 

**Office of
Energy Projects**

**August 2004**

Tennessee Gas Pipeline Company                    Docket No. CP04-60-000

# Tewksbury-Andover Lateral Project

# Environmental Assessment

EXH. B

- 27 -

4.     Land Use, Recreation, and Visual Resources

a.     Land Use

A total of about 30.3 acres would be impacted by construction of the Tewsbury-Andover Lateral Project facilities. This total includes 24.4 acres of temporary pipeline ROW of which 12.46 acres would remain as permanent ROW, a total of about 2.8 acres at 23 additional temporary work space areas for road crossings, about 0.1 acre for construction through portions of the route containing wetlands, waterbodies, steep side slopes, bedrock outcrops, and road, railroad, and utility crossings, about 0.1 acre for construction of an access road to the interconnect site, and approximately 2.9 acres for two pipe and contractor yards.

Pipe storage and contractor staging areas would be needed at MPs 0.8 and 4.2, respectively, totaling about 2.9 acres. The pipe storage area would be located within NEP's and MEC's substation property adjacent to the 250-foot-wide electric power transmission ROW, where the land use is designated as open space/utility. The staging area at MP 4.2 would be located in a parking lot.

About 4.3 miles (about 80 percent) of the 5.3-mile-long pipeline would be located within NEP's and MEC's 250-foot-wide electric power transmission ROW. About 0.4 mile of forest land would be crossed temporarily affecting about 1.1 acres during construction, of which about 0.7 acre would remain as permanent ROW and be maintained in an herbaceous, scrub-shrub state. In addition, a total of about 2.2 miles of wetlands would be crossed by the pipeline temporarily affecting a total of about 7.2 acres, of which a 20-foot-wide strip would remain as a 2.4-acre permanent ROW.

Other land uses affected by the project include open land (10.1 acres during construction; 6.0 acres for operation); residential land (1.4 acres during construction; 0.9 acres for operation); and commercial/industrial land (3.3 acres during construction; 2.1 acres for operation).

Of the 23 locations along the route where residences would be located within 50 feet of the construction ROW, Tennessee identified five residences at MPs 1.4, 1.5, 1.6, 2.2, and 2.5 that would be located within 25 feet of the construction ROW. Tennessee filed site-specific plans for the five residences and stated that at these locations it would excavate the pipeline trench immediately before installation of the pipeline, pre-fabricate the pipeline section, pad the trench prior to pipeline installation, and install the pipeline. This would minimize the time the trench is open to provide for a minimum of landowner inconvenience. In the event that the pipeline trench is left open when construction is not in progress, Tennessee would install orange safety fence at the edge of the construction ROW adjacent to the residence for a distance of 100 feet on either side of the residence. In addition, Tennessee would minimize construction-related noise by working only

- 28 -

during daylight hours. However, construction activities may continue after dark if completion of an activity would be necessary to insure its personnel and/or site safety.

An easement would be used to convey the ROW to Tennessee. The easement gives the company the right to construct, operate, and maintain the pipeline in the ROW, and in return, Tennessee would compensate the landowner for the use of the land. Tennessee would compensate landowners for the fair market value of any property in accordance with applicable law and procedures. In its efforts to inform landowners about the project, Tennessee has held advertised open-house meetings, sent periodic mailings, and has held meetings between individual landowners and land agents.

If an easement cannot be negotiated with a private landowner and the project has been certificated by the FERC, the company may use the right of eminent domain granted under Section 7(h) of the Natural Gas Act and the procedure set forth under the Federal Rules of Civil Procedure (rule 71A) to obtain the ROW and additional extra work spaces. The company would still be required to compensate the landowner for the ROW and for any damages incurred during construction. However, the level of compensation would be determined by a court according to state law if Tennessee's project is certificated. In either case, Tennessee would compensate landowners for the use of the land.

Two S Trust, the Kachorises, the Diases, and the Powers, commented about devaluation of their respective properties once the properties are encumbered by a permanent pipeline easement. The impact a pipeline may have on the value of a land tract depends on many factors including size, existence of other pipelines or other utilities, the current value of the property, and current land use. Subjective evaluation is generally not considered in appraisals. This is not to say that the pipeline would not impact resale values. A potential purchaser of a property would make a decision to purchase based on his/her planned use of the property in question. The presence of a pipeline may or may not discourage someone from buying a particular property. However, each potential purchaser has a different agenda and differing capabilities to purchase a property. The effect that a pipeline easement may have on property values is a damage-related issue and should be negotiated between the parties during the easement acquisition process.

Two S Trust also requested that Tennessee increase the burial depth of its pipeline from three to five feet when constructing across its property. Tennessee did not address Two S Trust's request. With the possible exception of an increase in construction cost, we know of no reason why an increase in the burial depth of the pipeline by 2 feet in the project area should be an impediment to its construction. We do not believe that Two S Trust's request is unreasonable. Therefore, we recommend that:

- 29 -

**Tennessee should install its pipeline at a burial depth of a minimum of five feet below ground surface while constructing its pipeline across Two S Trust's property between MP 3.6 and MP 3.9.**

South Street commented that Tennessee's proposed route between MPs 4.9 and 5.3, where Tennessee proposed to construct the pipeline using the HDD method, would conflict with South Street's planned development. South Street's site development plan shows that Tennessee's HDD for this location would be routed directly under South Street's planned two-story parking garage. South Street stated that Tennessee's route would bisect the property and render it useless for development. South Street proposed instead a two-stage HDD to minimize the planned development area affected by Tennessee's HDD. South Street stated that its planned development had been widely accepted by representatives of the Town of Andover, the Commonwealth of Massachusetts, and the Federal government.

We reviewed South Street's comment and have found no evidence substantiating South Street's claim that its planned development has been widely accepted. According to information contained in letters dated June 22 and 25, 2004 from the Town of Andover's (Andover) Planning Department, no plans were ever formally submitted to Andover, nor has any agency or representative of Andover ever granted approval or indicated that approval would be granted to South Street's planned development. Andover stated that South Street had given small scale, general concept drawings to the Andover Planning Department but these have never been the subject of any review or discussion by Andover, its departments, or agencies. Thus the viability of the concept plan with respect to Andover's land use and zoning regulations has never been determined.

Moreover, Andover indicated that South Street's proposed two-stage HDD would be environmentally unsound as it would impact more acreage than Tennessee's HDD proposal and would impact environmentally sensitive areas in close proximity to the Shawsheen River and its associated wetlands. Andover further states that without a demonstrated justification for South Street's alternative route, Tennessee's proposed alignment is Andover's preferred route.

By letter dated June 21, 2004, the Manager for the Town of Tewksbury (Tewksbury) stated that South Street has on several occasions over the last few years approached Tewksbury regarding the development of projects that would impact Tewksbury, but that none of those proposals ever came to fruition. Tewksbury stated it continues to support Tennessee's Tewksbury-Andover Lateral Project.

Tennessee had contacted South Street's representatives to negotiate an alternative curved route that should have been more beneficial to South Street's stated development plans. The curved route would have incorporated a curved HDD that would lay the

- 30 -

pipeline in an arc that would avoid the center of South Street's property. Tennessee stated that while technically feasible, such a route would be more expensive to complete and would not be as accurate as the proposed HDD. However, Tennessee stated that it was unable to come to mutually agreeable satisfactory terms with South Street and all negotiations have ceased.

We analyzed South Street's proposed two-stage HDD and confirmed that South Street's proposed two-stage HDD reroute would impact significantly more environmental resources than Tennessee's proposed HDD route.

In view of the above discussion, and the probability that South Street's alternative two-stage HDD would impact more environmental resources than Tennessee's proposed HDD, we do not recommend South Street's reroute.

### b.    Public Land

Between MP 4.8 and MP 4.9 Tennessee' Tewksbury-Andover Lateral project would cross about 620 feet of Conservation Land administered by the Commonwealth of Massachusetts and Tewksbury under Article 97 (see table 1). No other national forests, state forests, or land administered by Federal, state, or local agencies, designated wilderness areas, nature preserves, or registered natural landmarks would be crossed by the project.

### c.    Visual Resources

There are no designated visual resources within the project area. Temporary visual impacts associated with pipeline construction would include the introduction to the countryside of a strip of denuded soil and the construction equipment associated with construction on the pipeline ROW, and the creation of a visual contrast with adjacent naturally vegetated areas. However, these impacts would be short-term and mitigated following construction and restoration through natural revegetation, and Tennessee's restoration efforts in accordance with our Plan and Procedures.

A permanent visual impact would typically not result where the pipeline would be installed in non-forested areas. However tree clearing of the construction ROW and maintenance of the permanent ROW in forested areas may result in visual impacts. Tennessee's proposal to route most of the pipeline through NEP's and MEC's existing electric power transmission corridor would minimize tree clearing and the associated potential visual impacts.

Because Tennessee's proposed aboveground facilities would be located within previously disturbed areas we do not anticipate any temporary or permanent visual impacts to result from construction or operation of these facilities. However, where

## CERTIFICATE OF SERVICE

I hereby certify under the penalties of perjury that this document was served by hand on May 5, 2005 to:  Vincent O'Rourke, Esq., Bowditch & Dewey, 311 Main Street, Worcester, MA 01615, John R. Maciolek, Esq., Berg & Laipson, 34 Mechanic Street, Worcester,  MA  01608, Lora M. McSherry, Esq., Phillips, Gerstein, Holber & Channen LLP, 25 Kenoza Avenue, Haverill, MA 01830 and by U.S. Mail on May 9, 2005 to:  Richard P. Owens, Esq., Verizon, 185 Franklin Street, 13th Floor, Boston, MA  02110-1585 and Gregory T. Arnold, Esq., Brown Rudnick Berlack Israels LLP, One Financial Center, Boston, MA  02111.

Dianne R. Phillips (BBO No. 552982)

# 2831533_v1